**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**


K.P., Individually and on behalf of M.P., a minor,

        Plaintiff,

-vs-                                 Case No.  2:05-cv-596-FtM-29SPC

COLLIER COUNTY SCHOOL BOARD,

        Defendant.

_____


## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

_____This matter comes before the Court on a Complaint (Doc. #1) filed on December 13, 2005,

filed by Plaintiff K.P., individually ("Parent"), and on behalf of M.P., her minor daughter.   The

matter was referred to United States Magistrate Judge Sheri Polster Chappell by the Honorable John

E. Steele, District Court Judge for the Middle District of Florida for a Report and Recommendation.

Pursuant to 20 U.S.C. § 1415(i)(2) the parties are requesting a *de novo* review of the Final

Order (FO)[1] of the Administrative Law Judge Jeff B. Clark ("ALJ") of the Florida Division of

---

[1]References to specific paragraphs in the Final Order of Administrative Law Judge Jeff Clark issued on November 17, 2005, Index Vol. I, pp. 167-189 will be designated as "(FO p. (no.), (¶ no.))".

Administrative Hearings ("DOAH") which was entered on November 17, 2005 after hearings which were conducted on June 8 and July 13, 2005. [2]

This Court has received the record of proceedings in the DOAH hearing,[3] the depositions submitted for inclusion in the record[4], exhibits[5], and the Proposed Findings of Fact and Conclusions of Law submitted by both the Parent and the Collier County School Board (Doc. #'s 18 and 19) filed on July 5 and July 7, 2006.

Based upon a review of the record and the parties' submissions, and with a consideration of the appropriate deference to be given to the ALJ's decisions, as well as the deference to be accorded the decisions of educational professionals, the Court now issues its Findings of Fact and Conclusions of Law.

---

[2]During the course of the hearing, K.P. called six witnesses: Terri Lonnerman, K.P., J.P., Beth Hand, Christian Rosario Ross, M.D., F.A.A.P., and Dalia Saffa-Biller, Psy.D. Respondent called eight witnesses: Alin Botoman, M.D., Dorothy Frederick, Bonita Matlack, K.P., J.P., Tracy Raskin, and Susan Withstandley.

[3]There are three volumes of Hearing transcripts - Volume 1 (June 8, 2005), Volume 2 (June 8, 2005 [Supplement to Volume I]), and Volume 3 (July 13, 2005). References to the Transcript of the Proceedings are designated herein as "T-(volume no.), (page no.):(line no[s])."

[4]The depositions of Beth Hand, Christian Rosioru Ross, M.D., F.A.A.P. And Dalia Saffa-Biller, Psy.D taken on July 12, 2005 and submitted for inclusion in the record by stipulation of the parties will be designated as "Hand Depo., (page no.):(line no[s])", Ross Depo.,(page no.):(line no[s])", and Saffa-Biller Depo.,(page no.):(line no[s])".

[5]References to the Petitioner's Exhibits (Pet. Ex. A - K) are designated herein as "Pet. Ex. (Letter-number[s])." Those with Bates Stamps will be referred to as "Pet. Ex. (Letter)[xxxxxx]." References to the Respondent's Exhibits (Res. Ex. A - H) are designated herein as "Res. Ex. (Letter-number[s])."

<u>FINDINGS OF FACT</u>

M.P. is the minor child of K.P., her natural mother, and J.P., her natural father.  (FO p. 169, ¶ 1; Pet. Ex. G [000153]) and is a permanent resident of Collier County, Florida. (Pet. Ex. G [000169]).  On November 12, 1999, M.P. was born 17 weeks prematurely, weighing 1 pound 6 ounces. (T-3, 33:9-19; Pet. Ex. G [000153]).  Since birth, M.P. has experienced a myriad of medical problems and procedures undergoing  several medical procedures to address multiple significant medical conditions and was in the Neo-natal Intensive Care Unit ("NICU") until March 2000. (FO p. 170, ¶ 3; T-3, 35:1–37:19).

M.P. still suffers from a number of medical issues, including expressive language delays, which limits her ability to appropriately respond to her needs, fine motor and gross motor delay, and Gastroesophageal Reflux Disease ("GERD"), which is commonly known as "reflux." (FO p. 170, ¶ 4; T-3, 39:7 –42:25; Ross Depo., 5:1-8).  M.P. has undergone surgery and takes medications to control her reflux, (FO p. 170,  ¶ 4), which was under control until March 2005. (T-3, 72:4 –75:22; Ross Depo., 6:10-14).

The Collier County School Board ("School Board") is a body corporate and governmental agency duly empowered by the Constitution and Statutes of the State of Florida to administer, manage, and operate the Collier County Public Schools within the School District of Collier County, Florida ("District").   The School Board  receives state and federal funding for education.  At all times relevant, M.P. was determined to be a child with disabilities who was authorized to receive services from the District using an Individualized Educational Plan ("IEP").[6] (FO p. 170, ¶ 5; Pet.

---

[6]Each IEP is developed by an "IEP team," which comprises educators with specialized training and skills in educating
(continued...)

Ex. A-2-1 [000111]; Pet. Ex. G [000109]).  At the time of the due process hearing, M.P. was five

and one-half years old and was a pre-kindergarten student at Corkscrew Elementary School ("CES"),

Naples, Collier County, Florida, one of the public schools operated by the District. (FO p. 169, ¶ 1;

Pet. Ex. A-2-1 [000111]).

M.P. requires Physical Therapy ("PT") a minimum of two times a week for a total of 60

minutes per week. (T-3, 56:1-10; Pet. Ex. A-2-8 [000118]; Pet. Ex. E-16-1; Pet. Ex. E-31-1; Pet. Ex.

E-34-1).  The District retained Ms. Tracy Raskin ("Raskin") to provide PT to M.P. during the 2004-

05 school year. (FO p. 171, ¶ 7; T-3, 87:17-19).  No evidence was presented that Raskin would be

assigned to CES after the 2004-2005 school year.  (FO p. 174, ¶ 15).  By September 30, 2004, M.P.

had only attended CES for a few weeks and had missed a number of days of school due to illnesses.

(Pet. Ex. I [100790]).

On September 30, 2004, an IEP was developed for M.P. that outlined services to be provided

to M.P. at school and at home, whenever she was going to be absent from school due to her disability

and frequent illnesses.[7] (T-3, 48:25 – 52:6; Pet. Ex. A-2).  The IEP called for M.P. to receive  PT for

---

[6](...continued)
children with disabilities.  In addition, the parents of each
disabled child are IEP team members.  Each IEP is "individualized"
to meet the specific needs of each child and assure that each child
receives a FAPE.  Each individual IEP sets measurable educational
goals in an effort to quantify the effectiveness of the IEP and the
instruction and related services the child is receiving. (FO p.
170, ¶¶ 5-6).

[7]Participants in the September 30, 2004 IEP included Mike
Burlew, LEA Representative, Patricia Snyder, Evaluation
Interpreter; K.P. an J.P., M.P.'s mother and father; Susan
Withstandley, ESE Teacher; Tracy Raskin, Physical Therapist;
Dorothy Frederick, Occupational Therapist; Debbie Ramos, RN; and
E.Ehrenberg, ESE Coordinator.

60 minutes per week during the traditional school calendar when school was in session (T-2, 41:12-16; Pet. Ex. A-2-8 [000118]), and up to 5 hours per week hospital/homebound services during the traditional school calendar when school was in session. (Pet. Ex. A-2-8 [000118]).

M.P. enjoyed physical therapy and made progress through most of the school year.  (FO p. 171, ¶ 8).  Around March 1, 2005, an incident occurred where M.P. fell down in PT, sat momentarily on the floor, but was not injured.  (T-2, 48:11-24; T-3, 143:15 – 144:1; T-3, 144 19-23; Pet. Ex. D-7-1 [000179] & D-7-2 [000180]).

On March 29, 2005, Susan Withstandley ("Withstandley") reported to Terri Lonneman ("Lonneman") that M.P. had a problem in PT and was crying for her mother. (T-2, 8:21-25).   M.P. was returned to class where the teacher was easily able to calm her down.  (Pet. Ex. D-9-3 [000184]. Lonneman reported the event to K.P. (T-1, 69:24 – 70:14; T-1, 71:1-8; T-2, 8:13 – 9:24; Pet. Ex. D-9-2 [000184] & D-9-3 [000214]).  Because of their concerns for M.P., K.P. and J.P. visited the school and attended M.P.'s physical therapy session.  (T-3, 77:13-23,Tr-3, 81:4-82:10; Tr-3, 189:16-191:7).  Otherwise, each physical therapy session was successful with no indication of sickness or anxiety being experienced by M.P. as observed by Raskin.  (FO p. 171, ¶ 8).  No evidence was received into the record that the physical therapy services being provided by Raskin deviated from acceptable norms. (FO p. 171, ¶ 8).  To the contrary, independent observations reflected appropriate conduct. (FO p. 171, ¶ 8, Tr-3, 81:4-82:10 ; Tr-3, 189:16-191:7; Tr-3, 244:6-21; Tr-3, 248:20-23;Tr-3, 302:7–303:5).

Beginning in the last week of March 2005, M.P.'s parents noticed a change in their daughter which included increased reflux symptoms.  (FO p. 171, ¶ 8).  M.P. also started asking about "Ms. Tracy."  When M.P. was told there was no therapy, her symptoms abated.  If M.P. was told that she

was going to PT, symptoms increased and would last up to five minutes. (T-3, 75:20-22; T-3, 76:5-24; T-3, 90:18-20).

In the morning of April 5, 2005, K.P. prepared and delivered a note to Lonneman that M.P. was anxious about PT that morning.  K.P. requested to come to the school at 10:00 a.m., before M.P.'s PT, to discuss her concerns. (Pet. Ex. I [101009]).  On April 6, 2005, K.P. and J.P. sent a note to CES reasserting M.P.'s reflux issues and requesting that M.P. not be instructed to perform actions that will cause M.P. to become upset. (Pet. Ex. E-20-2).  Later that day when K.P. picked M.P. up from therapy,  M.P. reported that:  "Ms. Tracy's mean to me; she hurt my legs."  (T-3, 85:3-8).

On April 7, 2005, K.P. sent an Email to Withstandley requesting that M.P. not receive any further PT until K.P. could determine why M.P. was refluxing each morning prior to school. (Pet. Ex. E-22-1).  On April 7, 2005, K.P. took M.P. to see Christian Rosiouru Ross, M.D.  ("Dr. Ross") to treat M.P.'s increased reflux symptoms.  Dr. Ross has been M.P.'s treating gastroenterologist since M.P. was about six months old. (Ross Depo., 4:17-23). During the ride to Dr. Ross' office, M.P. reported to her mother that: "Miss Tracy's mean to me.  Miss Tracy yells at me.  Miss Tracy hits the kids.  Miss Tracy hit me.  She hurt my legs."  (T-3, 86:5-7; T-3, 136:9-12; T-3, 149:4-22). K.P. reported M.P.'s symptoms to Dr. Ross and told him about M.P.'s statements in the car.  Dr. Ross advised K.P. to change therapists in order to reduce the reflux.[8] Dr. Ross provided a note indicating that M.P.'s parents should be present when PT is given to M.P. to possibly prevent

---

[8]The ALJ found "the opinions expressed in this letter have little credibility; Dr. Ross indicates that the letter reflects the mother's feelings, which he supports.  Importantly, he indicates that M.P. has sensory issues that causes her to experience anxiety/fear in educational settings, and his records reflect that M.P. continued to have exacerbated symptoms in July 2005 several months after physical therapy ended."  (FO p. 172, ¶ 11).

medical complications due to GERD. (T-3, 92:16-19; T-3, 94:10-12; Ross Depo., 9:10-12; Pet. Ex. E-23-1 [000030]; Pet. Ex. E-24-1).

On April 8, 2005, K.P. told Lonneman that Dr. Ross recommended that M.P. not have PT with Ms. Tracy again. (T-3, 96:13 – 97:2; T-3, 145:2-11; T-3, 148:19 – 149:3). Lonneman told K.P. that Lonneman would have to contact the ESE office and notify them. (T-3, 97:5-6).

On April 12, 2005, Dr. Ross sent another note indicating that M.P. needed to be seen by a different physical therapist to prevent any further medical problems. (Ross Depo., 9:6-12; Pet. Ex. E-27-1; Pet. Ex. G [000047]). On April 12, 2005, Lonneman sent a letter to K.P. indicating that K.P. could either cease PT for M.P. or could attend the PT sessions with Ms. Tracy. (Pet. Ex. E-26-2 [000049]).

On April 15, 2005, K.P. sent a note to Withstandley, Lonneman, Karen Stelmacki (ESE Assistant Director), and Dr. Ehrenberg (ESE Coordinator), withdrawing consent for PT to be given to M.P. by Ms. Tracy, but requesting PT from another therapist. (Pet. Ex. E-29-1 [000043]). On April 15, 2005, J.P. met with Lonneman, who said that M.P. could either have PT with Ms. Tracy, they could be present during her PT, or she would cease to have PT. (T-3, 97:24 – 99:20). On April 15, 2005, M.P. still needed PT. (T-2, 4:9-18; T-3, 99:22-23).

On April 18, 2005, M.P. was given a PT evaluation by Beth Hand ("Hand"). M.P. did not experience any symptoms of GERD during or after the PT evaluation. (T-3, 113:14-24; Pet. Ex. C-4-1 [000039], C-4-2 [000040] & C-4-3 [000041]). On April 18, 2005, Dr. Ross provided a note to the District that attributed M.P.'s increased symptoms of GERD to the emotional stress that M.P. was experiencing with Ms. Tracy. It was noted that the current therapist was detrimental to M.P.'s health and compromised M.P.'s medical condition. (Ross Depo., 9:14-21; Pet. Ex. E-30-1 [000028]).

On April 21, 2005, K.P. verbally told M.P.'s teacher and Lonneman that M.P. was not to receive PT from Ms. Tracy anymore. (T-3, 100:14-23; T-3, 102:18-22).  On April 21, 2005, Dr. Martin McKenna sent a note to the District that K.P. needed to receive educationally relevant PT two times per week. (T-2, 3:5-19; Pet. Ex. E-31-1).

On April 22, 2005, Lonneman sent a letter to K.P. and again stated that K.P. could either be "present to observe the therapy sessions or choose not to send M.P. to the therapy sessions." (T-2, 3:20-22; Pet. Ex. E-32-1 [000037]).

On April 25, 2005, J.P. and K.P. sent another letter to the District expressing their concerns about M.P.'s health and safety and their express request for M.P. to receive PT from someone other than Ms. Tracy. (Pet. Ex. E-33-1 – E-33-3).  On April 25, 2005, K.P. met with Tim Romano, ESE Coordinator, to discuss M.P.'s PT.  (T-3, 102:24 – 105:4).

On April 26, 2005, an IEP meeting was conducted.  At that meeting, J.P. gave members of the IEP team a group of documents addressing M.P.'s health and progress. (T-2, 24:2 – 28:15; Pet. Ex. E-34-1; Pet. Ex. E-35-1; Pet. Ex. E-36-1 through E-36-9; Pet. Ex. E-37-1; Pet. Ex. E-38-1; Pet. Ex. E-39-1; Pet. Ex. E-40-1; Pet. Ex. E-41-1 & E-41-2; Pet. Ex. E-43-1).

On April 26, 2005, Ms. Tracy conducted PT with M.P. without K.P.'s consent. (T-3, 100:10-13).  On April 26, 2005, around 1:15 p.m., Lonneman called K.P. and told her that Ms. Tracy had given PT to M.P. (T-2, 43:24 – 45:1; T-3, 108:3-15).  K.P. immediately went to CES and picked up M.P. (T-3, 108:14-16).  M.P. complained that her belly was hurting and continued to complain throughout the following day. (T-3, 108:15 – 109:22).

On April 26, May 2, May 3, and May 4, 2005, K.P. requested that M.P. be provided PT by another therapist.  Lonneman indicated that the school was willing to provide PT services to M.P.

but the only available therapist that they had to offer for those therapies was Raskin. (T-2, 30:19 – 31:9).    Raskin   was   the   only   person   assigned   to   CES   to   provide   PT.   (T-2,   31:4-14).

On May 3, 2005, K.P. went to CES and expressly stated that Ms. Tracy was not to provide PT to M.P. again. (T-3, 117:9-10).   On May 4, 2005, the District offered to provide PT to M.P but K.P. refused the services if they were to be provided by Raskin.   (Pet. Ex. E-46-1 [000019]).  Due to K.P.'s refusal to have M.P participate in PT with anyone else, M.P. did not receive physical therapy on May 4, 2005.   (Pet. Ex. E-46-1 [000019]).  On May 4, 2005, K.P. filed a due process demand.

On May 6 and May 12, 2005, Dr. Saffa-Biller evaluated M.P. (Pet. Ex. C-5-1; Saffa-Biller Depo., 6:1-13).  M.P. reported that "Miss Tracy was mean, that Miss Tracy yelled and hit the other kids, that Miss Tracy threw a ball at either her legs or her feet." (Saffa-Biller Depo., 9:19-21 & 10:14-19).  Dr. Saffa-Biller observed increased anxiety with M.P. whenever a school topic was discussed. (Saffa-Biller Depo., 11:2-3).   Dr. Saffa-Biller opined that based upon her initial assessment of M.P. and a review of her medical records provided to her by the parents, that it is evident that the past relationship/therapy experience needs to be further evaluated and explored, and that M.P. needs to be placed with a different physical therapist at this time. (Pet. Ex. C-5-1 & C-5-2). Dr. Saffa-Biller also noted that there is a medical necessity for M.P. to immediately resume physical therapy services with a different therapist and that M.P. should participate in weekly short term individual therapy in order to better help clarify/understand the reason for M.P.'s distress associated with her past physical therapist/therapy experience and to help her to benefit from needed future physical therapy.  (Pet. Ex. C-5-1 & C-5-2).

On May 10, 2005, Dr. Ross examined M.P. and noted that M.P. was losing weight. (Ross Depo., 7:14-21). On May 13, 2005, Dr. Saffa-Biller issued a report of her evaluation which K.P. hand delivered to Lonneman on May 16, 2005. (T-3, 120:5-9; T-3, 119:3-19; Pet. Ex. C-5-1, C-5-2). K.P. told Dr. Ross that M.P. was complaining of abdominal pain, was refusing to eat or drink, had an increased cough, spitting up, with symptoms occurring as M.P. got ready to go to school. (Ross Depo., 20:15 – 21:10). No objective tests were performed on M.P. (Ross Depo., 21: 20-22).

M.P. was again evaluated on July 6, 2005, by Dr. Ross. M.P. had no change in height or weight. K.P. informed Dr. Ross that M.P. complained of stomach pain after each meal, was constipated, and was sleeping a lot, however, M.P. had not had any further incidents of reflux since the end of school. (T-3, 157:5-18; Ross Depo., 22:4 – 23:6). Dr. Ross noted that M.P.'s affect was different; noting that "[s]he's like in fear, afraid, withdrawn…." (Ross Depo., 25:17 – 26:5).

## ALJ'S FINDINGS

The ALJ found that the Respondent drafted, with the cooperation of the parents, an appropriate IEP which was reasonably calculated to confer educational benefits for M.P. in that: (a) the IEP provides measurable goals and objectives; (b) the IEP defines the educational program proposed for M.P. in clear, objective terms in order to assure a truly individualized, specially designed program to meet M.P.'s unique educational needs; and ( c) the IEP is reasonably calculated to confer meaningful educational benefits. (FO p. 186-187, ¶ 1). The ALJ found that the Petitioner has failed to establish that M.P. requires a change in her physical therapist to receive a FAPE (FO p. 187, ¶ 2) and that the Respondent's designated physical therapist was fully qualified and readily available to provide the educational services required by M.P.'s IEP from and after the time M.P.'s parents refused to allow her to provide services. (FO p. 187, ¶ 3). The ALJ further found that the

Respondent's inadvertent failure to provide documents did not rise to the level of a procedural denial of a FAPE.  (FO p. 187, ¶ 4).

STANDARD OF REVIEW

DOAH has jurisdiction over the subject matter of and the parties to this proceeding. § 1003.57(5), Fla. Stat. (2005); Rule 6A-6.03311, Fla. Admin. Code, and 20 U.S.C. §§ 1400 *et. seq.* The parties were provided adequate notice of the administrative hearing before DOAH. The District Court has jurisdiction over the parties and the subject matter of this proceeding.  20 U.S.C. § 1415; § 1003.57(5), Fla. Stat. (2005).

Pursuant to the IDEA and the companion Florida Statutes,[9] the School Board must provide the disabled child with a "free appropriate public education" ("FAPE")[10] designed to meet his unique needs. Walker County School District v. Bennett ex rel. Bennett, 203 F.3d 1293, 1294 (11th Cir. 2000).  FAPE does not mean that the School Board must provide service that will maximize a child's potential, nor does FAPE mean that the School Board must provide the best possible education as if its resources were unlimited. M.M. ex. rel. C.M. v. School Board of Miami-Dade County, 437 F. 3d 1085, 1102-1103 (11th Cir. 2006) (holding that a FAPE need not be the best possible education

---

[9]Section 230.23(4)(m) of the Florida Statutes was enacted, and Rule 6A-6.03311 of the Florida Administrative Code was promulgated to carry out the mandates of the IDEA. The relief is identical to the relief available under the IDEA.

[10]The IDEA defines "free appropriate public education" as "special education and related services that - - (A) have been provided at public expense, under public supervision and direction, and without charge, (B) meet the standards of the State education agency,(C) include an appropriate preschool, elementary, or secondary school education in the State involved; and (D) are provided in conformity with the individualized education program required under section 1414(d) of [the IDEA]."  20 U.S.C. § 1401(8).

nor one that will maximize the child's educational potential)); <u>JSK v. Hendry County School Board</u>, 941 F.2d 1563, 1573 (11th Cir. 1991) (holding that maximum improvement is never required)).

Integral to the concept of an "appropriate" education is the notion that the services provided must be tailored to serve the individual needs of the child. To insure that each child's individual educational needs are met, the school and parents work together to develop an individualized education program. ("IEP").

If the parents and school cannot agree on the contents of the IEP, either party may request a due process hearing. In Florida, due process hearings are conducted by an administrative hearing officer of DOAH. Fla. Stat. §230.23(4)(m)(4). The DOAH decision is a final order which entitles a party adversely affected to bring an action in either a federal district court or a state court of competent jurisdiction. 20 U.S.C. § 1415(e)(2); Fla. Stat. §230.23(4)(m)(4).

The issue before the Court, whether an IEP provided a FAPE, is a mixed question of law and fact and therefore subject to a *de novo* review. <u>Sch. Bd. Of Collier County vs. K.C.</u>, 285 F.3d 977, 979 (11th Cir. 2002). The Court "shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C.A. §1415(i)(2)(b).

The Supreme Court has established a two-part guideline for review regarding suits brought under the IDEA. <u>Doe v. Alabama State Dept of Educ.</u>, 915 F.2d 651, 655 (11th Cir. 1990) (quoting <u>Hendrick Hudson Cent.Sch. Dist. Bd. Of Educ. v. Rowley</u>, 458 U.S. 176, 206, 102 S. Ct. 3034,73 L. Ed. 2d 690 (1982)). The Eleventh Circuit Court of Appeals has issued an instructive decision in

another IDEA case, M.M. v. School Board of Miami-Dade County, 437 F.3d 1085 (11th Cir. 2006),

which relies on the U.S. Supreme Court's decision in Rowley.  Specifically, the Court must inquire:

> First, has the State complied with the procedures set forth in the Act: And, second,
> is the individualized educational program developed through the Act's procedures
> reasonably calculated to enable the child to receive educational benefits?  If these
> requirements are met, the State has complied with the obligations imposed by
> Congress and the courts can require no more.

Rowley, 458 U.S. at 206-07.

The Eleventh Circuit described the role of the district court in conducting a judicial review

of the ALJ's determination as follows:

> The district court answers the same two-part inquiry as outlined above: namely,
> whether the School Board followed the IDEA's procedural requirement and whether
> the proposed IEP was sufficient to provide the child with a FAPE.  Rowley, 458
> U.S. at 206 - 07, 102 S.Ct. At 3051, 73 L.Ed.2d 690.  "A 'yes' answer to both
> questions ends judicial review."  If these requirements are met, the State has
> complied with the obligations imposed by Congress and the courts can require no
> more."  M.M., supra at 1097.

Under Rowley, the reviewing court must give "due weight" to the established record of the

administrative proceeding. Id. at 207.  The amount of deference to be granted the administrative

decision is left to the discretion of the district court.  Jefferson County Bd. Of Educ. v. Breen, 853

F.2d 853, 857 (11th Cir. 1988).  The district court must, however, ensure that it does not substitute

its own judgment on sound educational policy for those made by officials at the state administrative

level.  Rowley, 458 U.S. at 206; Walker County School Dist. v. Bennett, 203 F.3d 1293, 1297 (11th

Cir. 2000).

## BURDEN OF PROOF

The burden of proof is generally on the party who is objecting to an existing or proposed IEP.

M.M. ex. rel. C.M., 437 F. 3d at 1096 n. 8 (citing Schaffer v. Weast, ----U.S.----, 126 S.Ct. 528, 537,

163 L. Ed. 387 (2005)); <u>Devine v. Indian River County School Board.</u>, 249 F.3d 1289, 1292 (11th Cir. 2001).   In the instant case, the Parent is the party challenging the administrative decision, and therefore, bears the burden of proof.

<u>CONCLUSIONS OF LAW</u>

The parties have agreed that M.P. is a disabled child and an exceptional student within the meaning of 20 U.S.C. § 1401(3), Fla. Stat.§ 1003.57 (2005), and Rule 6A-6.0301, Fla. Admin. Code, and is eligible for services as a child with disabilities under both federal and state law.   M.P. resides within the Board's jurisdiction and the Board must provide an appropriate education to M.P.   The Board is authorized to propose an IEP for M.P.   The Board developed the September 2004 IEP with the full participation of K.P. and J.P., who consented to the September 2004 IEP for M.P.   The Board was using the September 2004 IEP for M.P.   K.P. and J.P. objected to parts of the September 2004 IEP and special instructions services several months after the September 2004 IEP was implemented and specifically requested a new IEP on May 4, 2005.   The September 2004 IEP was the IEP in effect at the time that K.P. and J.P. requested a new IEP.

The Individuals with Disabilities Act (IDEA), 20 U.S.C. § 1400, provides that the local education agency must provide children with disabilities with a FAPE, which must be tailored to the unique needs of the handicapped child by means of an IEP program.   <u>Board of Education Hendrick Hudson Central School District vs. Rowley</u>, 458 U.S. 176, 102 S.Ct. 3034 (1982).

The determination of whether a school district has provided or made available to an "exceptional" student a "FAPE" involves a two-fold inquiry as the United States Supreme Court explained in <u>Rowley</u>:

> First, has the State [or district school board] complied with the procedures set forth in the Act [IDEA]? And Second, is the individualized educational program

developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?

If these two questions are answered in the affirmative, then "the State [school district] has complied with the obligations imposed by Congress and the courts can require no more." Id at 207. Specifically, "[t]he statute may not require public schools to maximize the potential of disabled students." Disabled students should have opportunities "commensurate with the opportunities provided to other children." Renner vs. Board of Education of Public Schools of the City of Ann Arbor, 185 F.3d 635, 644 (6th Cir. 1999).

As noted above, the first inquiry that must be made is whether the local educational agency has complied with the statutory procedures. The Parents assert that the School Board violated the IDEA's statutory procedural requirements by failing to: (a) provide all of M.P.'s educational records; (b) provide a objectively measurable present levels of performance standards; (c) consider parental input;(d) provide written notice that Risken would remain as M.P.'s physical therapist.

The second prong of the Rowley test to determine the appropriateness of an IEP is whether the "[IEP] developed through the Act's [IDEA] procedures [is] reasonably calculated to enable the child to receive educational benefits." Rowley, 458 U.S. at 207.

Pursuant to the IDEA, the School Board is required to provide M.P. with a FAPE. In Rowley, the Court stated that, "in seeking to provide such access to public education, Congress did not impose upon the States any greater substantive educational standard than would be necessary to make such access meaningful." Rowley, 458 U.S. at 192. More importantly, the Court held that "the intent of the [IDEA] was more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside." Id. The Supreme Court has opined that the IDEA does not require a school district to provide an "equal" education

-15-

to a handicapped child.  <u>Rowley</u>, 458 U.S. at 198.  Rather, the IDEA requires the Respondent to

ensure that the Petitioner receives "some benefit" from his educational program.  <u>Id</u>.   at 199.

The U.S. Court of Appeals for the Eleventh Circuit has carefully followed the U.S. Supreme

Court's analysis of the FAPE standard in requiring local school systems to provide "some"

educational benefit to eligible children with disabilities.  <i>See</i> <u>Devine vs. Indian River County School

Board</u>, 249 F.3d 1289 (11th Cir. 2001); <u>J.S.K. vs. Hendry County School Board</u>, 941 F.2d 1563

(11th Cir. 1991); <u>Drew P. vs.. Clarke County School District</u>, 877 F.2d 927 (11th Cir. 1989).  In

<u>Drew P.</u>, the Court stated, "[t]he state must provide the child only with a 'basic floor of

opportunity.'" <u>Id</u>. at 930.

### DISCUSSION

The issues presented, as described in the ALJ's Final Order (FO) concerned whether the

School Board had failed to provide M.P. with FAPE under IDEA and under § 1003.57, Florida

Statutes by: (1) failing to design and implement an appropriate Individual Education Plan (IEP);

(2)refusing to change the physical therapist for M.P.; ( 3) requiring M.P. to undergo physical therapy

with a person who was inappropriate for M.P.'s unique needs; or (4) requiring M.P. to forego

physical therapy.  At the due process hearing, Petitioner also asserted that Respondent's failure to

provide certain "educational records" constituted a procedural omission that denied M.P. a FAPE.

### I. PROCEDURAL

#### *(1) Whether the Board Provided M.P. with an Appropriate IEP*

#### *(a) Educational Records*

The Parents argue that M. P. did not receive FAPE because the School Board failed to provide

all of M.P.'s educational documents to them prior to the DOAH hearing.  The Parents suggest that

the School Board failed to timely produce certain "educational records" as required by Section 1002.22, Fla. Stat. (2004).

In the event that the School Board fails to produce "educational records," Subsection 1002.22(5), Florida Statutes, provides, as follows:

> In the event that any public school official or employee, district school board official or employee...refuses to comply with any of the provisions of this section, the aggrieved parent or student shall have an immediate right to bring an action in the circuit court to enforce the violated right by injunction.  Any aggrieved parent or student who brings such an action and whose rights are vindicated may be awarded attorney's fees and court costs.

In reviewing the record, it is clear that the School Board failed to provide some educational documents in a timely manner.  However, there is no indication the School Board refused to comply with a records request, just that some records were inadvertently left out of the production. The ALJ addressed the issue in his final order.

The ALJ found:

> While Petitioner alleges that Respondent's failure to timely provide educational records effected a procedural denial of a FAPE, there is scant evidence to support the allegation.  Given the fact that M.P. is a pre-kindergarten student, Respondent produced an incredible volume of documents evidencing the care and consideration given M.P.'s unique educational needs. (FO p. 176-177, ¶ 23).

The ALJ found that a few documents "slipped through the cracks" but noted  the evidence reflected that "Respondent made every attempt to provide Petitioner with documents requested and when the existence of documents was discovered, they were immediately produced."  (FO p. 176-177, ¶ 23). The ALJ specifically found: "There is no evidence that Petitioner suffered any detriment as a result of the late production of documents." (FO p. 177, ¶ 23).

As indicated by the ALJ, the records were provided when the existence of the documents was discovered.  Further, as  evidenced by the transcript, when asked by the ALJ whether or not they were so disadvantaged for the late production of documents that they would want a continuance, counsel indicated that "my client does not wish to do that " and that the client "wishes to get the case resolved." (T1, p. 27-31).   Therefore, the Court finds, as did the ALJ, that it does not appear that the Parent suffered any prejudice as a result of the late production of documents and finds that there was no material violation which would have resulted  in a violation of due process.

### (b) Objectively Measurable Present Levels of Performance Standards

The Parents allege that the School Board violated M.P.'s right to FAPE because it failed to provide M.P. with an IEP reasonably calculated to provide M.P. with educational benefit.  Pursuant to 34 C.F.R. § 300.347 (1), the IEP for each child must include "a statement of the child's present levels of educational performance." 34 C.F.R. § 300.347(a)(2), the section that addresses annual goals specifically calls for "a statement of measurable annual goals, including benchmarks or short-term objectives..."

For example, in the IEP in question, the Measurable Annual Goal indicates: "She will demonstrate functional fine and gross motor, balance and coordination to participate in her learning environment with 80% target achievement prior to next IEP."  The category for Independent Functioning in the IEP developed on September 30, 2004, M.P.'s Present Level of Educational Performance is described as follows:  "Her balance has improved and she is showing emerging skills for jumping. [M.P.] is very independent and strives to do all tasks herself.  She can open drinks and utensils with minimal assistance.  She uses utensils 50% of the times with teacher reminders."

The IEP also sets Short-Term Objectives or Benchmarks such as:

2-1    Marissa will jump up 2 inches without losing her balance.
        Schedule:     weekly
        Criteria:      3 of 5 times
        Evaluation:    Data Collection Teacher Observation Therapist
                         Observation

Pet. Ex. A [000114].

In order to reach these measurable annual goals, the IEP developed on September 30, 2004, offered two 30-minute sessions per week of physical therapy by a qualified physical therapist who was assigned to M.P.'s school by the School Board.

Based upon the evidence in the record, the Court finds that the IEP for M.P. included a statement of her present levels of educational performance, and a statement of measurable annual goals, including benchmarks or short-term objectives.  Further, it is clear that the School Board provided the child with a physical therapist who is qualified and possesses the skills necessary to provide the services required by her disability.  Thus, the Plaintiff's assertion  that M.P. was denied FAPE because her IEP lacked objectively measurable goals lacks merit.

### (c) Parental Input

The facts of the case do not show that the Parents were precluded from participating or making informed decisions regarding M.P.'s therapy.  M.P.'s Parents were allowed to participate in the process from the very beginning and were in on the development of the IEP.  In addition, M.P.s Parents were allowed to sit in on a physical therapy session with M.P. and Raskin.  So contrary to the Petitioner's argument, the record supports a conclusion that M.P.'s Parents had input into M.P.'s physical therapy and IEP.

Further, it is well settled that the choice of educational methodology and placement is a matter of discretion  within the authority of the School Board.  Although the Parents are active

participants in an IEP process, they do not single-handedly control the outcome of the process.  As

the U.S. Supreme Court has stated, "[t]he primary responsibility for formulating the education to

be accorded a handicapped child and for choosing the educational method most suitable to the

child's needs, was left by the Act to state and local educational agencies in cooperation with the

parents or guardian of the child."  Rowley, 458 U.S. at 207.   Once it is shown that the Acts

requirements have been met, questions of methodology are for resolution by the responsible

authorities.  Lachman vs. Illinois State Board of Education, 852 F.2d 290 (7th Cir. 1988), *cert.*

*denied*, 488 U.S. 925 (1988).

In regard to this issue, the ALJ concluded:

> The law does not require Respondent to accede to a parent's preferences.  Rather, the
> law merely requires the School Board to provide "appropriate" educational services
> to enable M.P. to receive "some educational benefit."  It is irrelevant whether the
> parents' approve of the physical therapist offered by Respondent.  The only relevant
> issue is whether Respondent has offered a FAPE in accordance with the requirements
> of the IDEA and Florida State Law. (FO p. 184-185, ¶ 36).

The ALJ concluded after his analysis that "[t]he clear weight of the evidence shows that the IEP

and M.P.'s current physical therapist meets the FAPE standard."  (FO p. 185, ¶ 185).  This Court

in its independent review finds no reason to disturb the finding of the ALJ.

### (d) Written Notice that Raskin Would Remain as M.P.'s Physical Therapist.

The Eleventh Circuit has held that the purpose of the procedural notice requirement is to

include the full participation of all parties in the IEP process. Doe v. Alabama State Department

of Education, 915 F.2d 651, 662 (11th Cir. 1990).  For the Petitioners to prove that M.P. was

denied a FAPE, they must show harm to M.P. as a result of the alleged procedural violation. Weiss

by Weiss v. School Bd. of Hillsborough County, 141 F.3d 990, 996 (11th Cir. 1998).  The

Eleventh Circuit also noted that a violation of any of the procedures of the IDEA is not a *per se* violation of the Act. Id.

The Parents claim the School Board failed to provide prior written notice to them whenever the School Board proposed or refused to change M.P.'s regimen.  There is no issue that the Parents were notified of the date of the September 30, 2004, IEP since they were present for the discussions and decisions that took place and signed the IEP.  Pet. Ex. A [000111].  The Parents were fully involved in the development of M.P.'s  IEP.   *See* Doe v. Alabama State Department of Education, 915 F.2d 651, 661 (11th Cir. 1990) (holding that even if there was any deficiency in notification, it had no impact because the record showed the parents were fully involved in the process).

In this case, the Parents argue they should have been notified in writing prior to the School Board's decision not to change the physical therapist for M.P. after K.P. requested the change. Since there was no change in the status of M.P. receiving 60 minutes of physical therapy per week with a "qualified therapist," it does not stand to reason that the School Board would have notified the parents of anything.  There was no change to the IEP.  The School Board was maintaining the status quo.  Thus, the Court finds the Parents' argument that they were not given prior written notification of a refusal to change the specific therapist lacks merit.

### (2) Whether the School Board's Refusal to Change M.P.'s Physical Therapist Denied M.P. FAPE

The Parents assert M.P. was denied FAPE because CES would not replace Raskin as M.P.'s physical therapist.  The Parents, as the party challenging the IEP, have the burden of proof to demonstrate that the September 30, 2004, IEP did not offer a FAPE to M.P.

The U.S. Supreme Court has held that school districts satisfy the FAPE requirement "by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." Rowley, 458 U.S. at 203. "[T]he IEP, and therefore the personalized instruction, should be formulated in accordance with the requirements of the Act and if the child is being educated in the regular classrooms of the public education system, should be reasonably calculated to enable the child to achieve passing marks and advance from grade to grade." Rowley, 458 U.S. at 203-204. The IDEA creates a presumption in favor of a school system's educational plan, placing the burden of proof on the party challenging it. White vs. Ascension Parish School Board, 343 F.3d 373 (5th Cir. 2003); Teague Independent School District vs. Todd L., 999 F.2d 127, 132 (5th Cir. 1993).

The courts have uniformly rejected parental demands for schools to hire or assign particular individuals to assist their children with disabilities. A Federal court in California held parents do not have the right to demand a particular individual be hired as an aide for an 11- year-old child with autism. In Gellerman vs. Clalaveras Unified School District, 34 IDELR 33 (E.D. Cal. 2000), the court rejected the parents' claims that the aide must know the child well and must have previously worked with him. This demand, according to the court, would "impose too high a standard" for school districts and was not required by the IDEA. Rather, the court characterized the parents' demands as statements of desirable features in an aide, having slight legal effect, if any. See Michael P. vs. School Board of Indian River County, 34 IDELR 30 (S.D. Fla. 2001) (parents could not demand placement in a classroom where the teacher was a personal friend of the mother.").

A state-proposed IEP that meets the substantive requirements of the IDEA cannot be defeated merely because the parents believe a better educational program exists for their child. Lachman at 292.  Other Federal Courts, including the U.S. Court of Appeals for the Eleventh Circuit, have followed Lachman. See Greer vs. Rome City Schools, 950 F.2d 688 (11th Cir. 1991); Barnett by Barnett vs. Fairfax County School Board, 927 F.2d 146, 152 (4th Cir. 1991), cert. denied, 502 U.S. 859 (1991) (the IDEA mandates an education that is responsive to the handicapped child's needs, "but leaves the substance and the details of that education to state and local school officials"); Roland M. vs. Concord School Committee, 910 F.2d 983, 993 (1st Cir. 1990), cert denied, 499 U.S. 912 (1991) (the issue is not whether the program preferred by the parents is better, but whether the program proposed by the school district "struck an 'adequate and appropriate' balance on the maximum benefit/least restrictive fulcrum.").

In this case, the ALJ found:

> M.P.'s parents have demonstrated no legal right to demand the replacement of M.P.'s physical therapist so long as [the School Board] is providing a qualified individual who is meeting the educational objectives of the IEP."

The ALJ further concluded:

> "[t]he evidence establishes that M.P.'s IEP was appropriate for her in light of her individual educational needs.  That is, it was reasonably calculated to enable her to receive educational benefits.  The evidence also establishes that [M.P.] has actually made educational progress while the IEP has been in effect, which lends further support to the appropriateness of the IEP. (FO p. 186, ¶ 38).

The ALJ therefore, found  the "Petitioner has failed to carry her burden of establishing that M.P. requires a change in physical therapist to receive a FAPE." (FO p. 186, ¶ 38). The Court finds in its independent review that the parents are not entitled to a physical therapist of their choosing.

### *(3) Whether the School Board Required M.P. to Undergo Physical Therapy with a Person Who was Inappropriate for M.P.'s Unique Needs*

In April 2005, M.P.'s parents became concerned that M.P. was not receiving appropriate physical therapy as a result of M.P.'s apparent adverse reaction to Raskin. While no fault was found with Raskin, M.P. was reacting negatively to physical therapy. The Parents submitted a request to CES's principal that M.P.'s physical therapy be provided by a different physical therapist and refused further physical therapy provided by Raskin. Effectively, M.P.'s parents are asking the School Board to provide M.P. a different physical therapist because they believe their child is unhappy with the current physical therapist. The Parents must prove their allegation that the School Board's refusal to change M.P.'s physical therapist was inappropriate for M.P. and resulted in M.P. undergoing physical therapy with a person who did not meet M.P.'s unique needs

The Parents are entitled to a have a therapist for M.P. who is qualified and who is meeting the educational objectives of the IEP. The IDEA requires the provision of educational services by "qualified personnel." 34 C.F.R. § 300.23. "Qualified personnel" means "personnel who have met SEA-approved or SEA-recognized certification, licensing, registration, or other comparable requirements that apply to the area in which the individuals are providing special education or related services." Id. Each state is responsible for determining "the specific occupational categories required to provide special education and related services within the State." 34 C.F.R. § 300.136(b)(2).

Thus, the law is clear that the School Board is obligated to provide a physical therapist who is qualified and possesses the skills necessary to provide the services required by the child's disabilities. However, the law does not require that the School Board put the name of the physical therapist in the IEP; the physical therapist is assigned to the school (and its students) by the School

Board.  The ALJ specifically noted  in the September 2004 IEP, the Parents expressed concern regarding M.P.'s "interaction with therapists (she is shy, sometimes non compliant)." (FO p. 182, ¶ 33).  Although the parents expressed concerns, there is no evidence to suggest that Raskin, M.P.'s current physical therapist, does not possess the skills necessary to provide the services required for M.P.'s unique educational needs.(FO p. 182, ¶ 34).

A review of Raskin's record shows that she was assigned to CSE for the 2004-2005 school year.  Raskin is licensed by the State of Florida and had 14 years of educational physical therapy experience.  The ALJ found  "[t]here is no evidence that Ms. Raskin is not a 'qualified person[nel]'" (FO p. 182, ¶ 31).  The  Court can find no evidence to the contrary.  Clearly, based upon the review of the record, Rankin is providing M.P. with the physical therapy mandated by the IEP to meet the educational objectives of the IEP.  Therefore, this Court finds that Raskin  fits the definition of  "qualified personnel."

(*4*) *Whether the School Board's Requiring M.P. to Forego Physical Therapy in the Alternative to Having Physical Therapy with Rasken Denied FAPE*

The Supreme Court has held that the "'basic floor of opportunity' provided by [IDEA] consists of access to specialized instruction and related services which are individually designed to provide educational benefits to the handicapped child." Rowley, 458 U.S. at 210.  In the instant case, the School Board has designed an individualized program which, on its face, meets M.P.'s needs in physical therapy.  Raskin is competently providing those services called for in the IEP to M.P.  Therefore, the ALJ found that the "[r]espondent has complied with Rowley in this regard." (FO p. 182, ¶ 32).  Based upon the review of the record, Raskin is qualified and is providing M.P. with the physical therapy mandated by the IEP to meet the educational objectives of the IEP.

## II. SUBSTANTIVE

The Petitioner argues that the School Board failed to provide M.P. with FAPE by (1) failing to provide M.P. with an appropriate IEP; (2) failing to provide M.P. with necessary services; (3) failing to provide academic and non-academic positive benefits.

### (1) Whether the School Board Failed to Provide M.P. an Appropriate IEP

The Petitioner argues that the School Board failed to provide M.P. with an appropriate IEP because the IEP was procedurally deficient.   The ALJ found that:

> The evidence in the record establishes that M.P.'s IEP was appropriate for her in light of her individual educational needs.  This is, it was reasonably calculated to enable her to receive educational benefits.  The evidence also establishes that Petitioner has actually made educational progress while the IEP has been in effect, which lends further support to the appropriateness of the IEP.  Therefore, Petitioner has failed to carry her burden of establishing that she requires a change in physical therapist to receive a FAPE.  (FO p. 186).

After a thorough review of the record of proceedings in the DOAH hearing, the depositions submitted for inclusion in the record, exhibits, and the Proposed Findings of Fact and Conclusions of Law submitted by the Parent and the School Board, this Court finds that the School Board, with the cooperation of the parents, drafted an IEP which was reasonably calculated to confer educational benefits for M.P. in that: (a) the IEP defines the educational program proposed for M.P. in clear, objective terms in order to assure a truly individualized, specially designed program to meet M.P.'s unique educational needs; and (c) the IEP is reasonably calculated to confer meaningful educational benefits.  Therefore, M.P.'s IEP meets the procedural requirements of the IDEA and the two prong test established in Rowley.

### (2) The School Board Failed to Provide the Necessary Services.

The Petitioners argue that the School Board failed to offer necessary services because the only option was for M.P. to continue physical therapy with Raskin.  The IDEA only requires the provision of educational services by "qualified personnel."  34 C.F.R. § 300.23.  As noted above, Raskin fully met the state's qualifications for her position.   Therefore, the School Board met its obligations to provide M.P. with the necessary and least restrictive physical therapy available under the provisions of the IDEA.

*(3) Whether the School Board Failed to Provide Academic and Non-Academic Positive Benefits*

The Petitioner's argue that M.P. could not receive positive academic benefits because of her adverse reaction to Raskin.  The Parents argue that M.P. showed no improvement in her basic education skills.  However, the record contradicts the Parents assertions.  On April 26, 2004, M.P. received the following scores on her Galileo report.

| | Development Level Score | % | SS | NCE |
|---|---|---|---|---|
| a. Social and Emotional Development | 472 | 0.31 | -0.51 | 39.26 |
| b. Approaches to Learning | 429 | 0.08 | -1.38 | 0.94 |
| c. Fine and Gross Motor Development | 541 | 0.82 | 0.90 | 68.95 |
| d. Language and Literacy | 510 | 0.60 | 0.25 | 55.27 |
| e. Early Math | 525 | 0.71 | 0.55 | 61.48 |

M.P.'s Scores on March 17, 2005, on the same assessment demonstrated that M.P. had improved in most areas.

The March 17, 2005, scores are as follows:

| | Development Level Score | % | SS | NCE |
|---|---|---|---|---|
| a. Social and Emotional Development | 514 | 0.62 | 0.31 | 56.53 |
| b. Approaches to Learning | 559 | 0.90 | 1.28 | 79.96 |

|  |  |  |  |
|---|---|---|---|
| c. Fine and Gross Motor Development | 530 | 0.75 | 0.69  64.53 |
| d. Creative Arts | 529 | 0.74 | 0.64  63.48 |
| e. Language and Literacy | 534 | 0.77 | 0.72  65.16 |
| f. Early Math | 525 | 0.71 | 0.55  61.48 |
| g. Physical Health Sciences | 544 | 0.83 | 0.94  69.80 |

Based upon the results from M.P.'s Galileo reports, it appears that M.P. made substantial improvements in all categories except Fine and Gross Motor development which had a small decrease and Early Math which had no change over the course of the year.  It is further noted that M.P. also mastered or exceeded her planned physical therapy goals of being able to kick, throw, and catch a ball, jump 2" 3 out of 5 times without losing her balance, and she could steer a tricycle at least 40 feet.  Consequently, the record established that M.P. was receiving both academic and non-academic benefit from her IEP.

CONCLUSION

The Court finds that the Petitioner has failed to establish that M.P. requires a change in her physical therapist to receive a FAPE and that Respondent's designated physical therapist was fully qualified and readily available to provide the educational services required by M.P.'s IEP from and after the time M.P.'s parents refused to allow her to accept services.  The Court finds that the School Board's failure to provide documents did not rise to the level of a procedural denial of a FAPE.

More specifically and in conformity with the U.S. Supreme Court decision in Rowley, the State complied with the procedures set forth in the Act and the individualized educational program developed through the Act's procedures was reasonably calculated to enable M.P. to receive educational benefits.  Therefore, the State has complied with the obligations imposed by Congress and the courts can require no more.

Accordingly, it is now

**RESPECTFULLY RECOMMENDED:**

Judgment Should be Entered in Favor of the Defendant Collier County School Board and against the Plaintiff K.P. on behalf of M.P., a Minor. The Final Order of the ALJ should be **UPHELD** in accordance with the Findings of Fact and Conclusions of Law and it is respectfully recommended that relief under the Complaint be denied.

**Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.**

Respectfully recommended at Fort Myers, Florida, this ___30th___ day of January, 2007.

SHERI POLSTER CHAPPELL
UNITED STATES MAGISTRATE JUDGE

Copies: All Parties of Record